*William Siam Simpson, III v. State of Maryland*, No. 22, September Term, 2014

**FIFTH AMENDMENT — ARTICLE 22 OF THE MARYLAND DECLARATION OF RIGHTS — OPENING STATEMENTS —** Petitioner's right against compelled self-incrimination, safeguarded by the Fifth Amendment, Article 22 of the Maryland Declaration of Rights, and Section 9-107 of the Courts and Judicial Proceedings Article, was violated when the prosecutor, during the State's opening statement, said "the defendant will tell you" when referring to the defendant's written confession to the police. The remarks were susceptible of the inference by the jury that they were to consider the silence of the defendant as an indication of guilt, and the error created by those remarks was not harmless.

Circuit Court for Prince George's County
Case No. CT10-0832X
Argued: November 7, 2014

IN THE COURT OF APPEALS
OF MARYLAND

No. 22

September Term, 2014

_____

WILLIAM SIAM SIMPSON, III

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: April 7, 2015

It is well understood that the federal and Maryland constitutions prohibit the prosecutor in a criminal case from making an adverse comment upon the defendant's failure to testify. *Griffin v. California*, 380 U.S. 609 (1965) (holding that the prosecutor's comment during closing argument concerning the defendant's failure to testify violated the Self-Incrimination Clause of the Fifth Amendment); *Smith v. State*, 367 Md. 348, 358 (2001) (holding that the prosecutor's comment during closing argument violated Article 22 of the Maryland Declaration of Rights); *see also* Md. Code (2013 Repl. Vol.) § 9-107 of the Courts and Judicial Proceedings Article.[1] The question we answer in the present case is whether the remarks the prosecutor made—not during closing argument, but rather in opening statement—ran afoul of that prohibition. We hold that, under the facts of this case, the answer is yes, thereby entitling Petitioner, William Siam Simpson, III, to a new trial.

I.

Petitioner was charged in a multi-count indictment with crimes in connection with three incidents that occurred at the house where Petitioner's former girlfriend, Jasmine Byers, and her family resided. All three incidents occurred at night. The first incident involved the intentional burning of the detached garage on the property; the second involved the intentional burning of the roof of the house; and the third involved an attempt to set fire to an automobile parked on the driveway. Mrs. Byers witnessed part of the third

---

[1] That section reads: "A person may not be compelled to testify in violation of his privilege against self-incrimination. The failure of a defendant to testify in a criminal proceeding on this basis does not create any presumption against him."

episode and began screaming at the culprit, who then fled the scene. The family contacted the police. Upon arrival, the police reviewed with members of the family a video-recording of the incident, which had been captured by a surveillance camera the Byers had installed after the previous fires. The family informed the police that they recognized the masked individual, by reference to his walk, body frame, and posture, to be Jasmine's former boyfriend, Petitioner.

The police went to Petitioner's home, where Joy, an accelerant-detecting dog, scanned the outside of a car parked there. Joy alerted to the presence of an accelerant on the driver's side door handle and the trunk. The police then went to the house and, upon knocking, were allowed by Petitioner to enter. The police smelled gasoline as they entered the house, and one of the officers placed Petitioner under arrest. Petitioner consented to a search of the interior of the car and the house. Joy detected additional accelerant inside the trunk and passenger area of the car. During the search of the house, the police seized from Petitioner's bedroom a pair of tennis shoes. Subsequent testing of the shoes disclosed the presence of gasoline.

Petitioner was transported to the police station, where he was advised of and waived his *Miranda* rights.[2] Left alone with pen and paper, Petitioner wrote, without assistance or involvement of the police, the following statement:

> I William Siam Simpson III burned the garage down of the byers house. I set the fire inside the garage. I ran away and let the fire burned. I just poured gasoline all over the garage and let it burn. The second attempt was the roof that I set on fire. I just climbed up the tree pour gasoline and just left. Let

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

the house burned.  My third attempt was tonight.  I wore a mask, gloves, leather jacket, poured gasoline all over the nissan altima and tried to burn it. I'm crazy and I need help.  I have anger management issues I cannot control myself.  Put me in the chair for lethal injection.  I'm ashamed of what I become I failed my family, friends, and myself.  God help me!

Petitioner signed the statement confirming that it was "true and correct to the best of my knowledge."

Thereafter, a detective conducted an interview, took notes of his questions and Petitioner's responses, and then had Petitioner review and sign each response at the end of the interview to verify that the written version was fair and accurate.  As we shall see, the State introduced into evidence both Petitioner's handwritten confession and the confession produced during the detective's interview of Petitioner.

Petitioner was charged in a ten-count indictment and tried in the Circuit Court for Prince George's County.  The first trial resulted in an acquittal of one of those counts and a mistrial on the remaining nine counts.

On retrial of the remaining counts, the prosecutor included the following in her opening statement to the jury:

> On November the 15th, 2009, the Defendant came onto the Byers' property, came to their home, and set their detached garage on fire. It burned down to the ground, along with all of their personal and sentimental property inside.
> And on April the 4th, 2010, the Defendant came back to the Byers' home and set the roof of their home on fire. There were four family members home at the time. They woke up in the middle of the night, or in the early morning hours, to a smoke-filled house and flames.
> On May the 16th, 2010, yet again, the Defendant returned back to the Byers' home, and while on video surveillance poured gasoline on Mrs. Byers' car and attempted to set it on fire.
> Ladies and gentlemen, I'm going to tell you up front that this is not a who-done-it case, . . . and this is not [a] trial where the facts of how the crime

3

was committed [are] missing, and this is not a case where motive is a mystery.

> Ladies and gentlemen . . . , the Defendant **himself will tell you, number one, that he burned down that garage** –

(emphasis added).

Defense counsel objected, and the court overruled the objection, without comment.

The State continued:

> —he committed those crimes of arson. And further, **he'll tell you why he did it**.
>
> **But even with the Defendant's own words**, the State—I will bring members of the Prince George's County's Fire Marshal's office, and members of the Prince George's County Police Department, here to testify before you.
>
> And they're going to sit right there in that jury box and **they're going to corroborate everything that the Defendant has said . . . .**
>
>         ***
>
> **[A]t the end of this trial I'm going to ask you to listen to what the Defendant has said, to listen to how his words are corroborated** . . . .

(Emphasis added). Before making his opening statement, defense counsel informed the court that he intended to make an "additional motion" either before or after opening statement. The court asked counsel to proceed directly to opening statement. As he did, defense counsel stated, in relevant part:

> Based on the State's opening statement some of you may be wondering why are we even here.
>
> Based on her suggestion that my client is going to state—to stand up in front of you and admit to all of the offenses, you're saying, wait a minute, that doesn't make sense, something doesn't make sense here; if he's guilty, why don't, you know, you say he's guilty and let us all go about our business.
>
> Well, there's something that was not entirely clear from the State's opening statement, because what she's referring to is a so-called confession that my client gave.
>
> But if you've listened to that presentation where she said it's not a who-done-it case, we know he did it, he admitted everything; then forget it, forget about asking any questions, forget about your oath to listen to the

4

evidence before you render a decision—because then something's gone terribly wrong, because my client, William Siam Simpson, III, sits here before you with the presumption of innocence, and it is the State's job to prove beyond a reasonable doubt that he's guilty.

***

Let's talk about this so-called confession which the State—and I believe they even used the word. They acted like he's going to come up here and testify in front of you, as if he did all of these things.

My client, on May 16th of 2010, signed a statement, and that's what [the prosecutor] was referring to. The statement referred to the three incidents.

Following the parties' opening statements, the court dismissed the jury for lunch. At that time, defense counsel moved for a mistrial, arguing that, although he understood that the prosecutor was referring to his client's written statement, the prosecutor only spoke of what the Petitioner had said or would say, and the prosecutor "can't refer to a client's testimony or non-testimony. That's a Fifth Amendment right. He has a right not to testify." The judge denied the motion for a mistrial, noting only that Petitioner's confession is admissible as "evidence as to what his words are."[3]

---

[3] At a post-trial hearing on his motion for new trial, Petitioner renewed his challenge to the prosecutor's opening statement. The prosecutor maintained that she had been holding Petitioner's written confession in her hand during her opening statement, thereby suggesting to the jury, not that Petitioner would be testifying and admitting his guilt, but rather, that he had made a written confession to the police. The prosecutor, however, did not attempt to assert, and the record does not reflect, that she had made clear to the jury that she was holding the written confession. Defense counsel responded that he did not recall the prosecutor holding anything in her hand during opening statement, and, significantly, the court denied the motion without commenting, one way or the other, about the prosecutor's reference to having held the written confession during her opening statement.

As we shall see, the State assumes in its argument before us that the prosecutor, in fact, had the written confession in hand while delivering her opening statement. Given that the record on this point is far from clear, we cannot accept, as fact, the assumption the State asks us to make.

During its case-in-chief, the State offered into evidence the written confession Petitioner had made to the police as well as the detective's written interview with Petitioner. Petitioner elected *not* to testify in the defense case. At the close of all the evidence, the court, at defense counsel's request, included among numerous other jury instructions the following: "The Defendant has an absolute Constitutional right not to testify. The fact that the Defendant did not testify must not be held against the Defendant. It must not be considered by you in any way or even discussed by you."

During his closing argument, defense counsel again discussed the prosecutor's opening statement. He said in part: "She said my client would testify. She said it at least three times. And I objected. But she was permitted to make that statement. But the fact is, he didn't testify . . . . He made a statement to the police. But that's not testifying." The jurors found Petitioner guilty of only one of the nine counts before them—attempted second degree arson of the automobile.

On appeal to the Court of Special Appeals, Petitioner raised, among others, the claim that the prosecutor's opening statement violated his privilege against self-incrimination guaranteed by the Fifth Amendment, Article 22 of the Maryland Declaration of Rights, and § 9-107 of the Courts and Judicial Proceedings Article (hereafter "CJP"). The Court of Special Appeals concluded that there was no such violation and affirmed the judgment of conviction. 214 Md. App. 336, 381 (2013). Petitioner sought, and we issued, a writ of certiorari to review that decision, 436 Md. 501 (2014), and we now reverse. [4]

---

[4] Petitioner had also raised in his petition for writ of certiorari a challenge to the court's allowing a police officer to testify as a witness for the State about his training,

6

II.

Petitioner asserts that his right to protection from adverse comment on his decision not to testify at trial, guaranteed by the privilege against self-incrimination set forth in the Fifth Amendment, Article 22, and CJP § 9-107, was violated when the prosecutor in opening statement referred several times to what Petitioner "will tell" the jury. Petitioner maintains that the words suggested that the members of the jury could expect him to take the stand and admit his guilt. These words, without more, Petitioner asserts, created the constitutional error. The State counters that the prosecutor's words did not violate Petitioner's right to protection from adverse comment on the right not to testify, and even if the prosecutor's words did so, the error was harmless beyond a reasonable doubt.

---

handling and observations of the accelerant-detecting dog, Joy. Defense counsel objected, stating that the officer's testimony was expert testimony and the defense had not been properly notified pursuant to Md. Rule 4-263(d)(8). The trial court overruled the objection and allowed the officer to testify about Joy's alerts.

The Court of Special Appeals held that, although the trial court allowed the officer to testify as a non-expert, the error was harmless beyond a reasonable doubt. *Simpson v. State*, 214 Md. App. 336, 385 (2013). Petitioner therefore also included in his petition a question challenging that holding of the Court of Special Appeals. The State filed a conditional cross-petition on that point, arguing that the Court of Special Appeals erred in concluding, as a preliminary matter, that the officer was required to be qualified as an expert.

We granted certiorari on both Petitioner's petition and the State's conditional cross-petition. Since then, the State has withdrawn its cross-petition. We therefore no longer have before us the question of whether the officer was required to be qualified as an expert and, if so, whether the court's error in allowing the officer to testify without pre-qualification as an expert was harmless beyond a reasonable doubt. In light of our holding on the constitutional issue, which requires a new trial, it is unnecessary for us to decide whether the court's error in allowing the officer to testify without pre-qualification as an expert was harmless beyond a reasonable doubt.

The parties disagree about the proper legal standard by which to assess the challenged remarks of the prosecutor. As we shall see, the disagreement is resolved by application of the rationale underpinning the holdings of the Supreme Court in *Griffin v. California*, 380 U.S. 609 (1965), and this Court in *Smith v. State*, 367 Md. 348 (2001).

We start with the pertinent language of the Fifth Amendment to the Constitution of the United States: "No person shall…be compelled in any criminal case to be a witness against himself[.]" What the *Griffin* Court referred to as the "Self-Incrimination Clause," 380 U.S. at 611, was made applicable to the states in 1964. *Malloy v. Hogan*, 378 U.S. 1 (1964). The language of the Self-Incrimination Clause of the Fifth Amendment is nearly identical to that of Article 22 of our Declaration of Rights: "That no man ought to be compelled to give evidence against himself in a criminal case."

The Court decided *Griffin* less than one year after *Malloy*. The issue before the Court in *Griffin* was whether the prosecutor's comments in closing argument and the trial court's jury instructions on the defendant's failure to testify violated the Self-Incrimination Clause of the Fifth Amendment. 380 U.S. at 613. Griffin had been charged with first degree murder of a woman named Essie Mae and did not testify at the trial for murder. *Id.* at 609. The prosecutor commented several times on Griffin's failure to testify, including stating during his closing, "Essie Mae is dead, she can't tell you her side of the story. The defendant won't." *Id.* at 610–611. The trial court, following California statutory law, instructed the jury that the defendant had a constitutional right not to testify, yet,

> [a]s to any evidence or facts against him which the defendant can reasonably
> be expected to deny or explain because of facts within his knowledge, if he
> does not testify or if, though he does testify, he fails to deny or explain such

evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.

*Id.* at 610. The Supreme Court held that the Self-Incrimination Clause forbids both the comment by the prosecution on the accused's silence and the instructions by the court that such silence is evidence of guilt. *Id.* at 615.

This Court has had several opportunities to address the application of the Fifth Amendment, Article 22 of the Maryland Declaration of Rights, and CJP § 9-107 in the context of closing arguments. Insofar as our research discloses, the first opportunity was presented in *Smith v. State*, 169 Md. 474 (1936) (hereinafter *Smith I*). That case involved a trial on a charge of bastardy. *Id.* at 475. During closing arguments, the prosecutor pointed to the accused and said: "This prosecuting witness has testified that this defendant is the father of her child, and this defendant has sat here all during the trial and has not denied his fatherhood." *Id.* at 476. Understandably, given that *Smith I* predated by nearly three decades the Supreme Court's decision in *Malloy v. Hogan*, we relied solely on Article 22 in holding that the prosecutor's remark violated that provision of our state constitution because "it was susceptible of the inference by the jury that they were to consider the silence of the traverser in the face of the accusation of the prosecuting witness as an indication of his guilt." *Id.*

We further concluded, however, that the trial court's error in permitting the prosecutor's statement was harmless. *Id.* at 477. We pointed out that the defense had promptly objected to the prosecutor's statement; immediately thereafter, the judge

9

instructed the jury that a defendant has the right not to testify; and the jury was prohibited from indulging an adverse presumption from either the defendant's election not to testify or the prosecutor's comments. *Id.* The judge also instructed the prosecutor that he should not comment further on that matter. *Id.* We held that the prosecutor's "error was followed so closely by its adequate correction at the hands of the court that the minds of the jurors could not have been prejudiced against the accused by the remark." *Id.*

We do not undertake here to revisit the harmless error analysis employed in *Smith I*. It nevertheless bears noting that *Smith I* was decided when errors occurring at criminal trials were subject to the same "no prejudice" standard as was applied in civil cases. *Dorsey v. State*, 276 Md. 638, 643 (1976). Since then, we have rejected the no prejudice test used in *Smith I* and formally adopted the standard announced by the Supreme Court in *Chapman v. California*, 386 U.S. 18 (1967). *See Dorsey*, 276 Md. at 658-59. Under the *Dorsey* standard, an error will be deemed harmless only if "a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict . . . ." *Id*. at 659.

Far more recently, we decided *Smith v. State*, 367 Md. 348 (2001) (hereinafter *Smith II*). As in *Smith I*, the case involved the prosecutor's comment, in closing argument, about the defendant's failure to testify. *Id.* at 354. The defendant in *Smith II* was on trial for burglary, conspiracy to obstruct justice, malicious destruction of property, and four counts of theft. *Id.* at 352. In his closing, the prosecutor argued:

> The Judge has said that you can look backwards in this case. Look to see who ends up with the property and then you can work backwards and here if the recent unexplained possession of stolen property allows you to work

10

> backwards to conclude, hey, this guy was the thief, this guy was the burglar. In making that conclusion, ask yourself this. *What explanation* has been given to us *by the defendant* for having the [stolen] goods? Zero, none.

*Id.* (emphasis in original). Over defense counsel's objection, the judge found that the prosecutor's statements were admissible as comments on the evidence. *Id.* On appeal to this Court, the defendant argued that the statements directly referred to his right not to testify and were not harmless error. *Id.* at 353.

We quoted with approval the test employed in *Smith I*: whether the prosecutor's remarks were "susceptible of the inference by the jury that they were to consider the silence of the traverser in the face of the accusation of the prosecuting witness as an indication of his guilt." *Id.* at 354 (quoting *Smith I*, 169 Md. at 476). We adopted the "susceptible of the adverse inference" test of *Smith I*, making clear, though, that "only those statements [by the prosecutor] that are reasonably or fairly susceptible of the inference by the jury are contemplated by the *Smith [I]* test." *Id.* at 356 n.6. Applying that test to the facts before us, we concluded that the prosecutor's remarks were directed at the defendant's constitutional right to remain silent, not the defense's failure to put on evidence. *Id.* at 359.

We then looked to determine whether admission of the impermissible remarks was harmless error. *Id.* at 360. We recognized that, "[w]hile not every impermissible comment by the prosecutor constitutes reversible error, the State bears the burden of proving that an error is harmless. The State must prove beyond a reasonable doubt that the contested error did not contribute to the verdict." *Id.* (citing *Dorsey*, 276 Md. at 659).[5] Concluding that

---

[5] The State in its brief, under the heading "Standard of Review" directs us to the following language from *Wilhelm v. State*, 272 Md. 404, 412 (1974): "[T]he prosecutor

11

the prosecutor impermissibly commented on the appellant's failure to testify, we held that the State was unable to carry its burden to establish beyond a reasonable doubt that the comment did not contribute to the guilty verdict. *Id.* at 361. We therefore reversed the conviction and remanded the case for a new trial. *Id.*

We see no reason to depart from the test employed in *Smith II* in determining whether the prosecutor's comments during opening statement concerning what Petitioner "will tell" the jury impinged upon his right to protection from adverse comment on his constitutional right not to testify. With the necessary adjustments of the *Smith* test to the context of opening statement, the test becomes whether the prosecutor's remarks in opening statement were reasonably susceptible of an adverse inference by members of the jury that the defendant's failure to testify would be indicative of the defendant's guilt.

III.

In this case, the prosecutor used the phrase "the defendant will tell you" several times during her opening statement. The State proposes that the intention of the

---

should be allowed reasonable latitude in his opening statement" and "[t]o secure a reversal based on an opening statement the accused is usually required to establish . . . [a] substantial prejudice resulting therefrom." To the extent the State is suggesting that this quoted language bears on the standard by which we assess whether the prosecutor's opening statement runs afoul of the protection against adverse comment on the defendant's failure to testify, we reject the suggestion. The language in *Wilhelm* indicating that reversal is warranted only if the accused "[has] establish[ed] . . . [a] substantial prejudice resulting therefrom[,]" *id.*, harkens to the test of harmless error that, since *Dorsey*, no longer applies in criminal cases.

We have no quarrel, moreover, with the proposition that the prosecutor has "reasonable latitude in its opening statement, but he should be confined to statements based on facts that can be proved." *Wilhelm*, 272 Md. at 412. Yet, as this case demonstrates, the prosecutor does not have latitude to suggest, intentionally or unintentionally, that the jury consider the defendant's decision not to testify.

12

prosecutor's words was not that they allude to what Petitioner would be testifying, but rather, to what he wrote in his confession. For purposes of this discussion, we shall accept this proposal. The State also wants us to accept that the prosecutor had in her hand, at the time she was making her opening statement, a copy of Petitioner's written confession. We shall accept that much, for purposes of our discussion, notwithstanding that the record is not at all clear on this point. *See supra* note 3. The State does not ask us to accept, and we will not assume, that the jury reasonably could have discerned that the document the prosecutor had in her hand was Petitioner's confession.[6]

Even granting to the State what it does ask us to accept, neither point bears on what is the only relevant question to be answered: whether the prosecutor's remarks were reasonably susceptible of the inference that Petitioner's failure to testify would be indicative of his guilt. Put simply, it was not what the prosecutor intended her words to mean,[7] or what she may have held in her hand at the time she uttered those words, that determines what the jury reasonably could have inferred from those words. We answer the

---

[6] We therefore are not addressing here a situation in which it is clear from the record that the jury would have understood that references in a prosecutor's opening statement to "the defendant's own words" and what they "will tell" the jury were unmistakably references to a prior written confession that would be introduced into evidence.

[7] This assertion reminds us of the following colloquy among Alice, the ("Mad") Hatter, and the March Hare:

> "Then you should say what you mean," the March Hare went on. "I do," Alice hastily replied; "at least--at least I mean what I say—that's the same thing, you know." "Not the same thing a bit!" said the Hatter. "You might just as well say that 'I see what I eat' is the same thing as 'I eat what I see'!"

Lewis Carroll, Alice in Wonderland Ch. 7 (The Millennium Fulcrum Ed., 2.7a. 2001).

13

relevant question by applying the *Smith II* "reasonably susceptible to adverse inference" test to the words the prosecutor employed in describing to the members of the jury what "Petitioner himself will tell [them]," in order to ascertain whether those words ran afoul of the Fifth Amendment, Article 22, and CJP § 9-107.

The Court of Special Appeals hinged its conclusion that there was no such violation in part on the prosecutor's single use of the present perfect tense—what "[Petitioner] has said" during her opening statement. The intermediate appellate court reasoned that this choice of words demonstrates that the prosecutor was referring to Petitioner's written confession, which was admitted into evidence during the prosecutor's case-in-chief. The Court of Special Appeals also relied on the prosecutor's reference to corroborating evidence that would be presented by other witnesses.

The analysis we employ in Maryland, which we aptly described in *Smith II* as "highly protective of a defendant's ability to exercise his Fifth Amendment right to remain silent[,]" 367 Md. at 355-56, does not require the dissection that our colleagues on the Court of Special Appeals undertook in examining the prosecutor's remarks in her opening statement. We cannot reasonably expect or assume that the jury, presumably unfamiliar with the nuances of the law, evidentiary rules, and trial procedures, naturally would have inferred from the prosecutor's words that she must be referring to what the evidence will show that Petitioner *had said*, before trial, in one context or another. If anything, it is as or more likely that the prosecutor's remarks in opening statement—that "the defendant himself will tell you" and "he'll tell you why he did it"—regardless of what the prosecutor intended them to mean—were reasonably susceptible of the inference by the jury that

14

Petitioner had an obligation to testify and, if he did not, the jury should view that as evidence of his guilt. Injection of that inference into the case impinged upon Petitioner's right not to testify, thereby violating the Self-Incrimination Clause of the Fifth Amendment, Article 22, and CJP § 9-107.

In a case remarkably similar to this one, the Supreme Judicial Court of Maine came to the same conclusion. *See State v. Turner*, 433 A.2d 397, 400 (Me. 1981). In that case, the defendant had given a detailed statement to the police, which the prosecutor referred to in opening statement as what the defendant "will say" and "will testify." *Id.* The defendant elected not to testify. *Id.* On appeal, the Maine supreme court rejected the State's contention that the prosecutor merely had used the wrong verb tense and held that "any adverse comment, whether clear or ambiguous, on the defendant's failure to testify violates the defendant's right to remain silent and requires" a new trial. *Id. See also Clark v. State*, 509 S.W.2d 812, 813, 815 (Ark. 1974) (holding that the prosecutor's remark in opening statement in the murder trial that the story "will come from [the defendant]" violated the defendant's right not to testify, as "we certainly cannot say with confidence that the remark of the prosecutor did not to some extent compel the defendant to testify in her own behalf").

In sum, the prosecutor's error in the opening statement entitles Petitioner to vacation of the judgment of conviction and a new trial, absent our finding the error to be harmless beyond a reasonable doubt. We turn to that inquiry next.

IV.

The State maintains that, if the prosecutor's opening statement were an impermissible comment on the defendant's right not to testify, which we conclude it was,

15

then the error was harmless. The State shoulders the heavy burden of establishing, beyond a reasonable doubt, that the contested error did not contribute to the verdict. *Dorsey*, 276 Md. at 659.

The State makes three points to support why, in its view, the prosecutor's impermissible comment was, in the end, harmless: the error was cured by the defense's opening statement and closing argument as well as the judge's instructions that the jury was not to draw an adverse inference from the fact that Petitioner did not testify; the error would have had an adverse impact on the State's—not Petitioner's—case; and the evidence to convict Petitioner was overwhelming. We are not persuaded.

Whether viewed separately or together, defense counsel's opening statement and closing argument did not render harmless the prosecutor's impermissible comment in the opening, but rather, rightly should be viewed as the defense counsel's reasonable effort to blunt the force of the unconstitutional blow inflicted during the prosecutor's opening statement. Neither did the court's instruction to the jury, given three days later and in the midst of what amounted to seventeen transcript pages of jury instructions, "cure" the error created by the State's opening. We likewise do not find persuasive—or relevant to the analysis required by the *Dorsey* standard—the State's argument that any harm generated by the prosecutor's remarks was prejudicial to the State, rather than the defense, because the State's de facto "promise" in opening statement that Petitioner would testify went unfulfilled when Petitioner did not to testify.

We also reject the State's argument that the evidence of Petitioner's guilt of the one count of attempted second degree arson was so overwhelming as to render harmless the

16

error in the State's opening statement. The jury's failure to find Petitioner guilty on eight of the remaining nine counts sheds light on the amount of weight, if any at all, the jury gave to Petitioner's written confession. In addition, the testimony of the State's witnesses, including in particular that of the Byers family, was subjected to extensive and vigorous cross-examination and, by our read of it, was likely to have suffered more than a few hits. In the end, our review of the State's evidence fails to persuade us, beyond a reasonable doubt, that the jury's verdict was "in no way influenced," *Dorsey*, 276 Md. at 658-59, by the prosecutor's adverse comment on Petitioner's failure to testify.

V.

The prosecutor "may strike hard blows, [but] he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). In this case, the prosecutor—whether intentionally or not—struck a foul blow by her remarks suggesting the Petitioner would "himself tell the jury" about his involvement in the charged crimes. Those remarks forced upon Petitioner a Hobson's choice[8]—either testify and subject himself to all the adverse consequences that might hold, or invoke his constitutional right to remain silent and risk that the jury would punish him for the prosecutor's error by inferring guilt from his failure to testify. The error

---

[8] "Hobson's choice" refers to the paradox of an apparently free choice when in reality there is no alternative. The phrase originated from the practice of Thomas Hobson, circa 1630s, an English liveryman, to require every customer who wanted to buy a horse to take the horse nearest the door. *The New Lexicon Webster's Encyclopedic Dictionary of the English Language* 460 (Bernard S. Cayne ed., Lexicon Publications, Inc., 1990) (1972).

17

that occurred in this case strikes at the core of the right that the Self -Incrimination Clause of the Fifth Amendment, Article 22 of our Declaration of Rights, and CJP § 9-107 were designed to protect.  The error, which was not harmless, entitles Petitioner to a new trial.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.  CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL.  COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**