Dissenting Opinion by
Adkins, J.
Because I believe that Ms. R.’s employment records are relevant, and their exclusion constitutes reversible error, I respectfully dissent.
Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Md. Rule 5-401 (emphasis added). We have explained that evidence is relevant “when, through proper analysis and reasoning, it is related logically to a matter ... that is properly provable in the case.” Snyder v. State, 361 Md. 580, 591, 762 A.2d 125 (2000). The Majority concludes that Ms. R.’s employment records are not logically related to Ms. R.’s intellectual disabilities, which the State must prove in this case. It reasons that
whether Ms. R. was able to perform various housekeeping duties was several inferential leaps removed from whether she was capable of “appraising the nature of the individual’s conduct” of a sexual nature, or of “resisting vaginal intercourse, a sexual act, or sexual contact,” or of “communicating unwillingness to submit to vaginal intercourse, a sexual act, or sexual contact.” The records would not have made it more or less probable that Ms. R. met the legal definition of a mentally defective individual.
Maj. Op. at 326, 163 A.3d at 283. I disagree with the Majority’s characterization of the employment records and do not find the connection to be so attenuated.
*328 Ms. R.’s employment records could have rebutted or mitigated some of the testimony by her family members and given the jury more insight as to whether she was, in fact, a “mentally defective individual.” The records, which were proffered by the defense, address more than Ms. R.’s ability “to perform various housekeeping duties.” Indeed, they reveal that Ms. R. was able to, and even liked to, communicate with her coworkers and supervisors. For example, one of Ms. R.’s annual performance reviews states, “We have developed ways of communication in spite of her inability to speak.” Another evaluation says that she “manages to get her point [across] to fellow associates and management” and “having worked with her for several years now[] makes it easier.” This evidence supports the testimony of Ms. R.’s coworkers, who stated that she was able to communicate with them. The records also speak to the extent of Ms. R.’s intellectual disability because they provide insight into whether she could “communicat[e] unwillingness to submit” to sexual intercourse—a critical issue in this case. Md. Code (1957, 2012 Repl. Vol.), § 3-301(b)(3) of the Criminal Law Article (“CR”).
Ms. R.’s employment records contain other evidence that potentially undercuts the State’s argument regarding the severity of Ms. R.’s intellectual disabilities. The records include quizzes about on-the-job safety in which Ms. R. answered questions about bloodborne pathogens and minimizing the risk of fire. They also contain emergency contact and change of address forms completed by Ms. R. They show that, at least to some extent, she is able to read and write. These records certainly have the tendency to make it less probable that Ms. R. was a “mentally defective individual” within the meaning of CR § 3-301(b).
The records are especially important—and their exclusion prejudicial—because the State presented rather limited evidence regarding Ms. R.’s intellectual abilities. It relied solely on lay testimony from Ms. R. and her family to show that Ms. R. was “mentally defective.” Ms. R.’s mother testified that her daughter went to a high school for “students with disabilities,” that she took her daughter to and from work, and that she *329 reminded her to perform certain daily tasks. Ms. R.’s sister testified that Ms. R. “couldn’t take care of herself for a whole day.” She further testified that she sometimes had difficulties communicating with Ms. R. Finally, when Ms. R. testified, the sign language interpreter had difficulty understanding her responses.
In light of this testimony pertaining to Ms. R.’s disabilities and difficulties communicating, excluding evidence to the contrary was not harmless. On this record, I cannot say that, beyond a reasonable doubt, the exclusion of Ms. R.’s employment records did not contribute to the guilty verdict against Fuentes. See Simpson v. State, 442 Md. 446, 457, 112 A.3d 941 (2015) (“[A]n error will be deemed harmless only if a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict.” (citation and internal quotation marks omitted)).
The Majority’s harmless error analysis regarding Fuentes’s written statement to hotel security is also troubling. It places undue weight on Fuentes’s answer to the prosecutor’s question, “[Y]ou realized working with [Ms. R.] that she has diminished capacity, correct?” Fuentes responded, “Because she wouldn’t talk and she could not hear.” The Majority acknowledges that his response is ambiguous, but then proceeds to accord it significance as a “failure to deny.” Maj. Op. at 308, 322-24, 164 A.3d at 272, 280-81. Fuentes’s use of “because” and his follow-on explanation could be construed as an implicit admission that he knew the victim was of diminished capacity. But his answer may well have meant that he did not know she was intellectually impaired, only that she could not hear or speak. I submit that an admittedly ambiguous statement cannot logically be transformed into a concrete “failure to deny” that “strongly supports a finding that he knew or reasonably should have known” that Ms. R. was intellectually disabled. Maj. Op. at 322, 164 A.3d at 285. This ambiguous statement does not tip the scales in favor of finding harmless error. Nor does it move the State closer to meeting *330 its weighty burden of proof—that, beyond a reasonable doubt, the error in no way influenced the verdict.