REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1085

September Term, 2014

_____

BRYANT WALLS

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Arthur,
Kenney, James A., III
    Retired, Specially Assigned

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: July 27, 2016

A jury in the Circuit Court for Baltimore County convicted Bryant Walls, the appellant, of two counts of first degree murder and one count of first degree burglary. The court sentenced him to two consecutive life terms for murder and a concurrent ten year term for burglary. He noted an appeal, presenting five questions, which we have combined and rephrased as four:

I. Did the trial court err by denying his motion for a mistrial based upon the prosecutor's remark during opening statement that the jurors would hear the appellant "testify"?

II. Did the trial court err by declining to give his requested jury instructions on the crime of burglary and by its answers to questions from the jury about that crime?

III. Did the trial court err by admitting a recording of a telephone call that he made from the Baltimore County Detention Center?

IV. Did the trial court err by denying his motion to dismiss the charges against him or to exclude the testimony of two State's witnesses as a sanction for alleged prosecutorial misconduct?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

Just after 2 a.m. on December 2, 2012, Walls killed Okemia Walls ("Okemia"), his estranged wife, and William Cunningham, her boyfriend. The charges against him were tried to a jury over five days in May 2014. The State's theory of prosecution was that the murders were willful, deliberate, and premeditated, and were committed in the course of a first degree burglary. Walls did not dispute his criminal agency, but took the position that he had killed the victims without premeditation or deliberation, and in hot-blooded response to legally adequate provocation, thereby mitigating the crimes to voluntary

manslaughter. He disputed that he had the requisite intent to commit first degree burglary. We summarize the relevant evidence adduced at trial.

Walls and Okemia had known each other for 23 years and had been married for 7 years. They had no children together, but each had adult children from prior relationships.

At the beginning of 2012, Walls and Okemia were living at 24 Venus Court, a two-story townhouse in the Northbrooke Township development in Parkville. Okemia's daughter, Meishon Moore, was the lessee of the townhouse and lived there as well. Venus Court is comprised of three groupings of townhouses configured in a U with a parking lot in the center.

Sometime in the spring or summer of 2012, Walls and Okemia separated. Walls moved in with his brother, Rick Walls ("Rick"), and Rick's wife, Angela Walls ("Angela"), in their home in Joppa, Harford County. According to Moore, Walls took all of his belongings with him, did not retain a key to 24 Venus Court, and did not have permission to be in the home thereafter.[1]

Cherod Hicks was living in an apartment at 1 Venus Court with his roommate, Whitney Franklin. Hicks and Franklin were friends with Walls and Okemia. Around 7 p.m. on December 1, 2012, Hicks called Walls and told him that a friend had attended a gathering at 24 Venus Court that day and had observed Okemia with a male companion. Upon hearing this, Walls got pretty "upset" and said, "This is why I wanted to be finished

---

[1] After Walls moved out, Moore had the locks changed.

with her." He asked Hicks to come pick him up. Hicks agreed, but later changed his mind. He fell asleep and awoke around midnight. His cell phone showed 15 missed calls from Walls. He did not call him back.

Meanwhile, at 11 p.m., Okemia, Cunningham, Moore, and Moore's boyfriend left 24 Venus Court and went to a local bar. Around 1:15 a.m. (by now December 2, 2012), Okemia and Cunningham returned to 24 Venus Court.

Moore and her boyfriend stayed at the bar until 1:30 a.m. They drove to pick up some food and then returned to 24 Venus Court. Moore, who was behind the wheel, pulled into the parking lot between the townhouses around 2 a.m. She saw Walls crossing the parking lot, walking toward her car. She opened her window and asked him what he was doing there. Walls was sweating and appeared angry. He replied that "he had to get that nigga" or that he had to "kill that nigga." Moore closed her window and drove away in a panic. She pulled around the corner and parked. She called Okemia's cell phone, but there was no answer. She then called Cunningham's cell phone, but that call also went unanswered. She called 911.

Shortly thereafter, Deanna Hunter, who was living at 30 Solar Circle, one street over from Venus Court, heard loud voices outside. She looked out her window and saw a man "pinn[ing]" a woman against an SUV and stabbing her with a knife. The woman fell to the pavement. Hunter heard the man say, "I told you I was gonna get you" as he was stabbing the woman. She called 911. While on the phone with the 911 operator, Hunter saw the perpetrator walk away. She went outside to render aid to the victim. She told the

911 operator that the woman was on her stomach, was bleeding profusely, and there was a "knife broken off in her back."

Meanwhile, Moore had driven back into the parking lot on Venus Court. She noticed that the front door of 24 Venus Court was wide open. She jumped out of her car and ran toward her townhouse. Walls was sitting on the outdoor air conditioning unit for the neighboring townhome. He said, "Mi, your mother is dead. I killed them both."

Moore ran inside the house and found Cunningham lying on the floor in the master bedroom "bleeding to death." She could not find her mother.

Moore's next door neighbor, Dawn Green, came outside. Green, who is a retired police detective, had been awakened by a loud thud, some faint screaming, and the sound of footsteps next door. She then heard someone knocking on the door of a nearby townhouse, later determined to be 30 Venus Court. She heard a female voice say, "Who is it," and a male voice reply, "Bubbles." (Walls's nickname is Bubbles.) The female voice asked, "Well, what do you want?" The male voice replied, "I just killed M[ami]," which was the nickname Walls used for Okemia.

Green retrieved her gun and police badge, and told her husband to call 911. She ran next door and, finding the door open, went inside and called out for Okemia. No one answered. She went upstairs and found Cunningham lying on the bedroom floor bleeding from the upper torso. He was still alive but could not speak. She told him she would get help.

Green ran back outside and saw Walls sitting on an air conditioning unit. She asked him where Okemia was and he replied, "I killed her." Green displayed her gun and

identified herself as a police officer. Walls took off running in the direction of Solar Circle. Green pursued him and yelled that she would shoot if he didn't stop. He exclaimed, "It's me. I did it. I did it. Don't shoot."

By then, Baltimore County Police Department ("BCPD") Officers Conrad Butler and Daniel Burns had arrived at Solar Circle. They found Okemia, partially clothed and lying face down on the pavement, with "horrific injuries on her back." A "tip of a piece of metal" was sticking out of her spine. Officer Burns recognized it as the base of a knife blade that had broken off. A black knife handle was found in the grass by her arm. The officers immediately observed Walls running toward them, hands in the air, with Green in pursuit. Walls was shouting, "I did it. I did it." The officers yelled for Walls to get on the ground. He complied and they placed him under arrest. His hands were covered in "wet, dripping blood."

Walls began to cry. He told the officers that the woman on the ground was his wife. He said he had found her in bed with another man. Indicating with his head toward 24 Venus Court, he said he had "left another one up there." Officer Butler entered 24 Venus Court and found Cunningham's body. Cunningham and Okemia were pronounced dead at the scene.

A BCPD crime technician photographed damage to the front door, doorframe, and casing at 24 Venus Court, as well as a muddy shoe print on the outside of the door. She also photographed blood smears on the door of 30 Venus Court.

At trial, a video recording of an oral statement Walls gave to the police on December 2, 2012, was played for the jury. In the statement, Walls said he and Okemia

had been reconciling and were planning to buy a house together. They had gone to the Siesta Motel on November 29, 2012, where they had sex. While they were there, Okemia received a call on her cell phone from a contact labeled "my baby." Walls answered Okemia's cell phone, and a man was on the line. Walls became angry and accused Okemia of cheating on him. She denied that she and the other man were romantically involved.

According to Walls, on December 1, 2012, he called Hicks and said he was going to come by his house (at 1 Venus Court) later that night to give Franklin some money to take to Okemia. Around 1:45 a.m. (on December 2, 2012), Walls hailed a "hack" cab in Joppa and was dropped off near an elementary school next to the Northbrooke Township development. From there, he walked toward 1 Venus Court. As he passed directly behind 24 Venus Court, he looked up at the second floor of the townhouse and saw Okemia and Cunningham through the window of the master bedroom. The room was illuminated by a television set. Okemia was naked and "hugging up" against Cunningham.

Walls recounted that he walked around to the front of the townhouses, where he encountered Moore. She drove up and asked him what he was doing there. He replied that he had come to see his wife. Moore said he should leave. She drove away. Walls walked up to 24 Venus Court, kicked in the door, grabbed a chef's knife he saw on the kitchen table, and went upstairs. When he entered the master bedroom, Cunningham saw him and "came at him." He and Cunningham "tussled" on the bed and he began "swinging the knife." He did not know how many times he stabbed Cunningham.

Okemia ran out of the room, and Walls ran after her. When he caught up with her outside, he grabbed her by the shoulder. She "got aggressive" and he "started swinging" the knife at her. The knife eventually broke. He thought it might still be inside her. After Okemia fell to the ground, he called 911 on his cell phone. He walked back to Venus Court and knocked on the door to 30 Venus Court. He told the neighbor that he had killed Okemia.

During his statement, Walls was distraught. He said the whole incident resulted from Okemia's "playing games with [his] emotions" and that he "couldn't deal with it." Several times he asked the police if Okemia was dead.

On December 4, 2012, the police executed a search warrant at the home in Joppa where Walls had been living with his brother and sister-in-law. On the kitchen counter, they found a butcher block containing knives with black handles. The largest knife was missing. They photographed the butcher block and seized one of the other knives. The photographs and the knife were introduced into evidence at trial, as was the knife handle found near Okemia's body.

During a jail visit with his sister, Walls admitted that he had taken a knife with him to 24 Venus Court on the night in question. A recording of this conversation was played for the jury. Subsequently, in a recorded jail phone call, Walls told his daughter that he was carrying a knife in the early morning hours of December 2, 2012, in case he encountered any "wild animals" while walking to 1 Venus Court. A recording of that call also was played for the jury.

The autopsy reports document that Okemia was stabbed eighteen times and sustained seven cutting injuries on her back, chest, arms, hips, hands, and face. A knife blade measuring eight and three-eighths inches was embedded in her back on the right side. Cunningham was stabbed ten times and sustained seven cutting injuries to his back, shoulder, abdomen, arms, and hands.

In his case, Walls called eight witnesses. His sister-in-law, Angela, testified that he had moved in with her and her husband in July of 2012, but had continued to see Okemia regularly. Two BCPD police officers testified that they had responded to the scene of the crimes on December 2, 2012, and had heard Walls admit to killing Okemia and Cunningham. The officer who transported Walls to the police station that night testified that Walls "began to cry and shake hysterically" while in the police car. Yet another BCPD police officer testified that he had observed blood stains on the door to 30 Venus Court. A private investigator testified that he had confirmed that Okemia had registered at the Siesta Motel on November 29, 2012.

We shall include additional facts in our discussion of the issues.

## DISCUSSION

### I.

### Opening Statement

### (a)

In opening statement, the prosecutor gave the following description of Walls's pursuit of Okemia after she ran out of 24 Venus Court:

Okemia runs out of the apartment down the steps. This is 2:00 a.m. on December 2nd, early December of 2012. She runs down the steps and she makes it to approximately this area, you'll hear testimony that's about 30 Solar Circle. This is the area where she ends up in front of 30 Solar Circle. She's running for her life. Ultimately, he catches her. ***You'll hear him testify that he just started swinging the knife.***

(Emphasis added.)

Immediately after the prosecutor finished his opening, defense counsel asked to approach the bench and the following ensued:

[DEFENSE COUNSEL]: Your Honor, I'm very concerned about one thing that [the prosecutor] said, and I know he didn't do it intentionally.

THE COURT: It was a misspeak.

[DEFENSE COUNSEL]: It was a misspeak –

THE COURT: I know it was.

[DEFENSE COUNSEL]: -- but it was a really serious misspeak.

THE COURT: I know it was.

[DEFENSE COUNSEL]: What he said was, "You will hear him testify," in reference to [Walls]. I'm gonna have to ask for a mistrial based on that. That is a basic right [Walls] has not to testify.

THE COURT: I know. It was an inadvertent choice of words.

[DEFENSE COUNSEL]: I know you didn't know –

[PROSECUTOR]: I was referring to what he said in his statement.

THE COURT: You were referring to his statement, and instead of saying, ["]You will hear in the statement,["] you said, "You will hear him testify." I'm denying the request for the mistrial. ***I would be happy to grant a curative instruction. They were told yesterday both in voir dire, and I***

-9-

*think in my opening instructions no burden.[2] I understand your objection* –

[DEFENSE COUNSEL]: *I can't say a curative instruction would come close to remedying it. If you give a curative instruction, you're highlighting it, and then that would be disastrous*.

THE COURT: *I will not highlight it. What I will do if you'd like, and you can talk to [Walls] about this over lunch, I would before we start with testimony remind them of certain things and give a burden of proof instruction and no duty on Defense to put on any testimony in evidence and never any obligation for [Walls] to testify*, and I would highlight those instructions at the beginning of the case, and then we'll renew them at the end. So, if you would like me to do that, I'll be happy to do that. If you choose to just leave it alone, I'll leave it alone, but I don't think a one-word misspeak in the middle of an opening gives rise to a basis for mistrial. So, you want –

[DEFENSE COUNSEL]: My request would be a mistrial.

(Emphasis added.)

Defense counsel then gave her opening statement. She did not mention the prosecutor's misstatement or otherwise comment on whether Walls would testify. At the conclusion of her opening statement, the parties again approached the bench:

[PROSECUTOR]: Your Honor, the State's position is that a curative instruction will suffice if [Walls] plans to testify. We are mindful of the Court's time, we are loathed [sic] to waste the Court's time in terms of the time we've spent during the trial up to this moment. If the Defense can't say at this point in the proceedings whether or not [Walls is] going to testify –

THE COURT: I mean, but the problem is and I believe it to have been just a misuse of a word –

---

[2] At the commencement of *voir dire*, the court had instructed the jurors that a criminal defendant has no burden of proof, does not need to present any evidence, and has an "absolute constitutional right not to testify."

-10-

[PROSECUTOR]: Absolutely.

THE COURT: – as opposed to an intentional statement, and in context it's a statement that lawyers in the courtroom react to and I think is not even noticed by others, but it certainly was one that when it was said, you know, it caught my attention.

[PROSECUTOR]: Your Honor, it was accidental and unintentional, however –

THE COURT: I mean, first of all, [Walls] doesn't have to elect one way or the other at this point.

[PROSECUTOR]: I understand, your Honor.

THE COURT: *Secondly – well, anyhow, let me see. Is the Defense asking for a curative instruction at this point or you're just standing on your mistrial*?

[DEFENSE COUNSEL]: *Your Honor, we want a mistrial* –

THE COURT: *Yeah, but you're not getting that. We're past that*.

[DEFENSE COUNSEL]: *I understand. Our position, your Honor, is that there is no curative instruction that can remedy this*. We're caught in that same position as in jury instructions, you know, where counsel can decide whether they even want the jury to be told about the Defendant's right to remain silent or not remain silent, because we understand that either way it could highlight the very issue that you're trying not to highlight.

*So, our position is no, we do not believe that a curative instruction can remedy this. We want the mistrial*. We agree with the court, of course, that [Walls] is under no obligation at all at this stage to make an election as to whether he's going to testify.

THE COURT: Okay.

[PROSECUTOR]: *Then, your Honor, out of an abundance of caution the State would concede the mistrial*.

THE COURT: *That makes no sense to me. I mean, none. I don't find a basis to grant a mistrial over the misuse of one word in an opening. I simply find no basis to grant a mistrial, period. Bring out the jurors*.

-11-

(Emphasis added.)

Walls elected not to testify. At the close of all the evidence, at Walls's request, the court instructed the jurors that Walls "ha[d] an absolute constitutional right not to testify. The fact that [he] did not testify must not be held against [him] and must not be considered by you in any way or even discussed by you in your deliberations."

**(b)**

Walls contends the trial court abused its discretion by denying his motion for mistrial. Quoting *Simpson v. State*, 442 Md. 446, 459 (2015), he argues that the prosecutor's remark in opening statement, that the jurors would hear him "testify that he just started swinging the knife," was constitutionally impermissible because it was "reasonably susceptible of an adverse inference by members of the jury that [his] failure to testify would be indicative of [his] guilt." Walls maintains that he had the right to decline a curative instruction, that such an instruction would have done more harm than good, and that the court's general instructions to the jurors about his constitutional right not to testify did not ameliorate the prosecutor's improper comment. He further argues that the evidence on the principal contested issue at trial—whether the murders were premeditated—was not so overwhelming as to render any error by the court in denying the mistrial motion harmless beyond a reasonable doubt.

The State responds that the prosecutor's inadvertent "single remark" in opening statement did not mandate a mistrial. It maintains that *Simpson* is distinguishable for a number of reasons, including that, here, the court offered to give a prompt curative instruction and had "inoculated" the jurors before the inadvertent comment by instructing

-12-

them that Walls had an absolute right not to testify.  Also, unlike in *Simpson*, Walls's criminal agency was not in dispute.

In *Simpson*, the Court of Appeals addressed for the first time the standard by which to assess whether a prosecutor's remark in opening statement violated the defendant's Fifth Amendment right not to testify.  Simpson was charged with multiple counts of arson and other crimes arising from three incidents at the home of his ex-girlfriend's family.  In the first incident, the family's garage was set on fire and burned down.  In the second incident, the roof of the family's house was set on fire.  And in the third, one of the family's cars was doused in gasoline and set on fire while it was parked in their driveway.  The third incident was captured on video and Simpson was arrested that same night.  He gave an oral statement to the police, in which he admitted setting all three fires.  He then handwrote a statement in which he again admitted to having set the fires.  He said that he was "crazy" and "need[ed] help."  He wrote that the police should "[p]ut [him] in the chair for lethal injection," and expressed shame about his actions.  During his oral statement, a police detective asked Simpson a series of questions and wrote down his responses.  Simpson initialed and signed that statement.

In opening statement, the prosecutor told the jurors several times what Simpson "will tell" them about the three fires.[3]  442 Md. at 451.  She said Simpson "will tell" them that he had "burned down that garage," that he had "committed the acts of arson," and

---

[3] This was Simpson's second trial.  His first trial ended in an acquittal on a charge of reckless endangerment and a hung jury on the remaining nine counts for arson and burglary.  Those counts were before the jury in the second trial.

"why he did it." *Id.* The prosecutor emphasized that even though the State had "[Simpson]'s own words" to convict him, it nevertheless would present additional evidence against him. The prosecutor concluded her opening statement by asking the jurors to "listen to what [Simpson] has said, to listen to how his words are corroborated [by other witness testimony,]" and to find him guilty. *Id.*

Defense counsel twice objected during the opening statement, but the objections were overruled. At the end of the prosecutor's opening, defense counsel advised the court that he would be making a motion. The court suggested that he wait until after he had given his own opening statement.

In his opening statement, defense counsel responded directly to the prosecutor's remarks:

> Based on [the prosecutor's] suggestion that my client is going to state—to stand up in front of you and admit to all of the offenses, you're saying, wait a minute, that doesn't make sense, something doesn't make sense here; if he's guilty, why don't, you know, you say he's guilty and let us all go about our business.
> Well, there's something that was not entirely clear from the State's opening statement, because what she's referring to is a so-called confession that my client gave.
>
> * * *
>
> Let's talk about this so-called confession which the State—and I believe they even used the word. They acted like he's going to come up here and testify in front of you, as if he did all of these things.
> My client, on May 16, 2010, signed a statement, and that's what [the State] was referring to. The statement referred to the three incidents.
>
> * * *

> If you look at this statement . . . the problem is, first, that as to the . . . the first two incidents—there's no evidence, other than this statement, that my client had anything to do with those incidents . . . .
> The other problem is, if you look at the statement, it is so vague that it does not have the ring of truth.

*Simpson v. State*, 214 Md. App. 336, 355–56 (2013). Defense counsel went on to assert that Simpson's statement to the police was a false confession.

Upon concluding his opening statement, defense counsel moved for a mistrial based upon the prosecutor's having said, several times, that Simpson "will tell" the jurors about his involvement in the crimes. He argued that those remarks were impermissible comments on Simpson's decision whether to testify, in violation of his rights under the Fifth Amendment. The court denied the mistrial motion on the ground that, when the prosecutor was speaking, she had been holding Simpson's written statement in her hand and merely was explaining what was in it. There was no request for a curative instruction.

Simpson elected not to testify. At defense counsel's request, the court instructed the jurors at the close of all the evidence that Simpson had an "absolute Constitutional right not to testify" and that the "fact that [he] did not testify must not be held against [him] [and] must not be considered by [the jury] in any way."

In closing argument, defense counsel again addressed the prosecutor's remarks in opening statement: "She said my client would testify. She said it at least three times. And I objected. But she was permitted to make that statement. But the fact is, he didn't testify. . . . He made a statement to the police. But that's not testifying." *Simpson*, 442 Md. at 453.

-15-

The jurors convicted Simpson of one count of attempted second degree arson arising from the vehicle fire. They were unable to reach a verdict on the remaining charges and the court declared a mistrial on those counts.

On appeal, this Court affirmed. The Court of Appeals granted a petition for *certiorari* and reversed. As background, it explained that the Self-Incrimination Clause of the Fifth Amendment, which applies to the states, *see Malloy v. Hogan*, 378 U.S. 1, 3 (1964), protects a defendant from being "compelled in any criminal case to be a witness against himself." Article 22 of the Maryland Declaration of Rights offers the same protection using "nearly identical" language. 442 Md. at 455. In *Griffin v. California*, 380 U.S. 609, 615 (1965), the Supreme Court held that the Self-Incrimination Clause prohibits a prosecutor from commenting in any respect upon a defendant's silence and forbids the court from instructing the jurors that a defendant's silence may be considered by them in any way in assessing the evidence.

The Court of Appeals examined two Maryland cases, both captioned *Smith v. State*, that address whether a prosecutor's remarks in closing argument impermissibly infringed upon a defendant's right not to testify. In *Smith v. State*, 169 Md. 474 (1936) ("*Smith I*"), which predated *Malloy* and therefore was decided under Article 22, the defendant was on trial for the (since abrogated) crime of bastardy. In his closing argument, the prosecutor pointed out that the mother had testified that Smith was the child's father, but Smith had "sat here all during the trial and ha[d] not denied his fatherhood." *Id*. at 476. The Court held that the comment violated Article 22 because "it was susceptible of the inference by the jury that they were to consider the silence of the

-16-

traverser in the face of the accusation of the prosecuting witness as an indication of his guilt." *Id*. The Court concluded that there was no prejudice, however, because the defendant had promptly objected and the court had given a curative instruction to the effect that the defendant had a right not to testify and that the jury was not permitted to draw an adverse inference from his decision not to testify.[4]

In *Smith v. State*, 367 Md. 348 (2001) ("*Smith II*"), the defendant was tried on charges of burglary, conspiracy to obstruct justice, malicious destruction of property, and theft. In his closing argument, the prosecutor told the jurors they could infer from the fact that the defendant was in possession of the stolen property that he was the thief, and further infer that he was the burglar. He then said, "In making that conclusion, ask yourself this, "*What explanation* has been given to us *by the defendant* for having the [stolen] goods? Zero, none.*" Id*. at 352 (emphasis in original). Defense counsel objected, but the court overruled his objection, concluding that the prosecutor's statement was a permissible comment on the evidence. There was no mistrial motion.

The case reached the Court of Appeals, which reversed. Applying the "susceptible of adverse inference" test from *Smith I*, it held that the prosecutor's remarks in closing were "directed at the defendant's constitutional right to remain silent, not the defense's failure to put on evidence." *Simpson*, 442 Md. at 458. The Court further held that the

---

[4] As the *Simpson* Court noted, however, in *Smith I*, the Court employed the then governing "no prejudice" standard, which later was replaced, in the criminal context, with the standard that the reviewing court be satisfied "beyond a reasonable doubt, that the error in no way influenced the verdict." *Dorsey v. State*, 276 Md. 638, 659 (1976).

court's error in allowing the argument was not harmless because the State could not show beyond a reasonable doubt that the improper argument did not contribute to the guilty verdict.

The *Simpson* Court adopted the *Smith I* and *Smith II* test to determine whether the prosecutor's challenged remarks in opening statement had "impinged upon Simpson's right to protection from adverse comment on his constitutional right not to testify." *Id*. at 459. In the context of an opening statement, the test is "whether the prosecutor's remarks . . . were reasonably susceptible of an adverse inference by members of the jury that the defendant's failure to testify would be indicative of the defendant's guilt?" *Id*. The Court held that the prosecutor's repeated assertions that Simpson "will tell you" about his involvement in the arsons were "reasonably susceptible of the inference by the jury that [Simpson] had an obligation to testify and, if he did not, the jury should view that as evidence of his guilt." *Id*. at 461. The Court rejected the argument that the prosecutor merely was explaining what Simpson had said in his written statement because, even if he was holding that document while giving opening statement, the jury had no way to know the document he was holding was Simpson's statement.

The Court turned to the question whether the court's error in denying the mistrial motion was harmless. The State argued that the error had been cured by the response leveled by defense counsel in his opening statement and closing argument, coupled with the court's instructions to the jury, all of which made clear that the defendant had a right not to testify and the jury could not draw an adverse inference from his not testifying. Alternatively, the State argued that the prosecutor's remarks were likely to be viewed by

the jury as an unfulfilled promise by the State, to its detriment, not Simpson's; and the evidence of Simpson's guilt was so overwhelming as to render the error harmless beyond a reasonable doubt.

The Court disagreed, reasoning that defense counsel's "reasonable effort to blunt the force of the unconstitutional blow inflicted during the prosecutor's opening statement" and the court's instructions, "given three days later and in the midst of what amounted to seventeen transcript pages of jury instructions," did not cure the violation. *Id*. at 463. It found unpersuasive the argument that the improper remarks would prejudice the State, not Simpson. It rejected the State's assertion that the evidence of Simpson's guilt was overwhelming, pointing out that the jurors had been unable to reach a verdict on eight of the nine charges before them, which suggested they had placed little weight on Simpson's statement. Moreover, the cross-examination of members of the family was "vigorous" and, in the Court's view, effective. In light of the weaknesses in the State's case, the Court was not convinced beyond a reasonable doubt "that the jury's verdict [on attempted second degree arson] was 'in no way influenced' . . . by the prosecutor's adverse comment on [Simpson's] failure to testify." *Id*. (quoting *Dorsey*, 276 Md. at 658-59).

We return to the case at bar. As the State concedes, under the test announced in *Simpson*, the prosecutor's comment in opening statement—that the jury would "hear [Walls] testify that he just started swinging the knife"—was susceptible of an adverse inference that Walls had an obligation to testify and, if he did not testify, that would indicate guilt on his part. Unlike in *Simpson*, however, here the trial judge recognized

-19-

that the prosecutor's statement was improper and proposed giving a curative instruction, which she spelled out.[5] Walls's counsel declined to have the court give that instruction. It was in this context that Walls's motion for a mistrial was denied. Walls urges that this was an abuse of discretion and reversible error. The State counters that any error was harmless beyond a reasonable doubt.

It is a basic precept that our function as an appellate court is to review the rulings of *the trial court* for error. *Cason v. State*, 140 Md. App. 379, 400 (2001) (appellate court function is to "review decisions, rulings, and actions of the [trial] court"). Our function is not to review conduct of counsel, the parties, or witnesses for error. We focus on the rulings of the court, some of which may be made in response to conduct of the lawyers, parties, or witnesses. *DeLuca v. State,* 78 Md. App. 395, 397–98 (1989) ("Only the judge can commit error" and counsel's, parties', or witnesses' "'conduct can do no more than serve as the predicate for possible judicial error.'") (quoting *Ball v. State*, 57 Md. App. 338, 359, (1984)). So, contrary to the phrasing used by both parties on appeal, the threshold question is not whether the prosecutor "erred" by telling the jurors, in opening, that they would hear Walls testify about swinging the knife. Rather, it is whether the trial court erred in denying the mistrial motion that was based on the prosecutor's comment.

A mistrial is an extreme remedy and it is well established that the decision whether to grant it is within the sound discretion of the trial court. *Carter v. State*, 366 Md. 574,

---

[5] The trial in this case took place before the Court of Appeals issued its opinion in *Simpson*.

589 (2001). When inadmissible evidence or improper information has come before the jury, the trial judge "must assess [its] prejudicial impact . . . and assess whether the prejudice can be cured." *Id.* If the prejudice cannot be cured, "a mistrial must be granted." *Id.* When a trial judge decides that the prejudice can be remedied by a curative instruction, and denies the mistrial motion and gives such an instruction, appellate review focuses on whether "the damage in the form of prejudice to the defendant transcended the curative effect of the instruction." *Kosmas v. State*, 316 Md. 587, 594 (1989).

In the case at bar, the court offered to give a curative instruction, but did not give it when counsel for Walls refused to agree to it. In deciding whether the trial judge abused her discretion in denying the mistrial motion, we first must assess whether the potential prejudice to Walls from the improper prosecutorial comment *could have been* cured by the proposed curative instruction. If the answer to that question is "yes," then we must determine the impact, if any, of Walls's decision to decline the court's proposed curative instruction.

There was no dispute here that the prosecutor misspoke when he used the word "testify." This one-word slipup, inadvertently made, is unlike the intentional comments in *Smith I*, *Smith II*, and *Simpson*. In *Smith I* and *Smith II*, the prosecutors' closing arguments openly invited the jurors to draw an inference against the defendant from his silence or his choice not to put on evidence. In that context, the prejudice to the defendant was great. Likewise, in *Simpson*, the prosecutor repeatedly informed the jurors in opening statement that the defendant would "tell" them that he had committed the acts of arson, creating the strong impression that the defendant would testify and that his

testimony would run counter to his defense of lack of criminal agency. The nature and number of these comments made them seriously prejudicial.

In this case, the trial judge found that the prosecutor's one-word "misspeak" (made in the course of an opening statement covering four transcript pages), although glaring to the court and counsel as people schooled in the law, probably did not even register to the jurors. This finding is entitled to deference. *See Simmons v. State*, 436 Md. 202, 212 (2013) ("'In the environment of the trial the trial court is peculiarly in a superior position to judge the effect of any . . . alleged improper remark[].'") (quoting *Wilhelm v. State*, 272 Md. 404, 429 (1974)); *State v. Hawkins*, 326 Md. 270, 278 (1992) ("The judge is able . . . to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his [or her] finger on the pulse of the trial."). Thus, the comment in question was susceptible of an adverse inference of guilt if Walls did not testify, but barely so, and therefore was minimally prejudicial.

As proposed by the trial judge, the curative instruction would have been given at the outset of the evidentiary phase of the trial (right after opening statements), and would have communicated to the jurors that the defense had no burden of proof, no duty to present any evidence, and that Walls had an absolute constitutional right not to testify. The court already had given these exact instructions to the venire panel at the beginning of *voir dire*, so the curative instruction would have appeared to the selected jurors to serve as a reminder. Contrary to the main concern expressed by counsel for Walls, the proposed curative instruction would not have "highlighted" the prosecutor's improper remark. It would not have mentioned the remark and would not even have seemed to

have been prompted by anything said in opening statements. The curative instruction would have been timely, unlike in *Simpson*, accurate, and, in our view, effective to counteract the minimally damaging impact of the prosecutor's improper remark. *See Carter*, 366 Md. at 589 ("If a curative instruction is given, the instruction must be timely, accurate, and effective.").

Having concluded that the court's proposed instruction would have been appropriately curative, we turn to address the impact, if any, of Walls's refusal to allow the court to give the curative instruction.

Citing *Hardaway v. State*, 317 Md. 160 (1989), Walls argues that he was entitled to decline the court's proposed curative instruction because it was an instruction advising the jury of his Fifth Amendment right not to testify, and therefore the only proper course of action for the court to have taken was to grant the mistrial motion. The State maintains that by declining the curative instruction, Walls waived his right to challenge on appeal the court's decision to deny his mistrial motion.

*Hardaway* was a follow-up to the Supreme Court's decision in *Lakeside v. Oregon*, 435 U.S. 333 (1978). In *Lakeside*, the defendant challenged on Fifth Amendment grounds a state trial judge's decision to give a "no adverse inference" instruction, as one of the general instructions given at the close of all the evidence, over the defendant's objection. The Court held that the trial court did not violate the defendant's Fifth Amendment right against self-incrimination by giving the "no adverse inference" instruction over the defendant's objection. It commented, however, that "[i]t may be wise for a trial judge not to give such a cautionary instruction over a defendant's

-23-

objection. And each State is, of course, free to forbid its trial judges from doing so as a matter of state law." *Id.* at 340.

In *Hardaway*, defense counsel asked the court *not* to give a "no adverse inference" instruction at the close of the evidence. The trial judge gave the instruction anyway. The case reached the Court of Appeals, which held, as a matter of Maryland common law, that, "absent special circumstances," it is error for a trial court to include in its jury instructions at the close of the evidence an adverse inference instruction except when the defendant has asked that the instruction be given. *Id.* at 161.[6] Observing that the purpose of the "no adverse inference" instruction is "to protect the defendant in the exercise of his constitutional privilege against self-incrimination," the court held that "the entitlement to have the jury instruction that no adverse inference should be drawn from the defendant's silence is itself a constitutional right belonging to the defendant." *Id.* at 166. The Court noted that some defendants prefer that the no adverse inference instruction not be given because it is "'more harmful than helpful,' in that it "may inadvertently cause the jurors to consider certain adverse inferences which would not otherwise have entered their minds.'" *Id.* at 165 (quoting *State v. Kimball,* 176 N.W.2d 864, 869 (Iowa 1970)). The Court reasoned that because the purpose of the instruction is to protect the defendant, "it should, like other rights, be waivable by the defendant." *Id.* at 166–67.

_____

[6] The Court gave as an example of a "special circumstance[]" a situation in which co-defendants were tried jointly and one co-defendant requested the "no adverse inference" instruction. 317 Md. at 169.

> [S]ince the instruction is a right of the defendant, for his benefit, but because the beneficial effect of the instruction may be uncertain in some circumstances, it follows that the decision whether the instruction is given should lie with the defendant.

*Id.* at 167.

The instructional issue in *Hardaway* arose in the setting of the trial court's charging the jurors on the law at the close of the evidence, not in the setting of a curative instruction. In *Carter v. State*, the Court of Appeals held that the defendant had no right to "waive, reject, or veto" a trial court's decision to give a curative instruction meant to ameliorate the negative impact of improper testimony about his prior bad acts. 366 Md. at 587. Without drawing any distinction between instructions given as a matter of course at the end of a case and curative instructions, the Court contrasted *Hardaway*, emphasizing that the defendant there was entitled to waive, reject, or veto the "adverse inference" instruction because that instruction is a right of the defendant, "in the context of [his] right against self-incrimination." *Id.* at 586. The Court's discussion would seem to suggest that a defendant has the right to waive, reject, or veto an "adverse inference" *curative* instruction, although the issue was not (and did not have to be) addressed.

The trial court in the case at bar left it to Walls to accept or reject the proposed curative "adverse inference" instruction. He rejected it. As noted, he maintains that at that point the trial court had no option but to grant the mistrial motion. The State maintains that, by rejecting an accurate and timely curative instruction that would have effectively eliminated whatever prejudice the prosecutor's remark produced, Walls waived the right to challenge on appeal the court's decision to deny the mistrial motion.

-25-

Ordinarily, a defendant "who refuses a trial court's attempt to cure an error . . . does not lose his right to raise the error on appeal." *Hayes v. State*, 217 Md. App. 159, 172 (2014). In *Fleming v. State*, 194 Md. App. 76, 93 (2010), this Court held that a defendant who declined the trial court's proposed curative instruction did not waive his challenge to the court's denial of his mistrial motion. The motion was made after a police officer testified, in response to a question from defense counsel on cross-examination, that she found two of the State's witnesses to be "credible." The trial court denied the motion, reasoning that the answer was responsive to the question asked. It offered to give a curative instruction advising the jurors that they were the sole judges of the credibility of witnesses. Defense counsel declined, noting that he had included a "credibility of witness" instruction in his proposed jury instructions to be given at the close of the evidence and would rather that the instruction be given then so as not to "alert the jurors as to the information that I have moved for a mistrial on." *Id*. at 92.

On appeal following conviction, the defendant challenged the trial court's decision to deny his mistrial motion. The State argued that by declining the curative instruction, Fleming had waived this contention. We disagreed.

> [A] defendant is not required, *as a matter of law*, to agree to a limiting instruction at the risk of waiving an issue for appellate review. A trial court may, and sometimes should, give a curative instruction on its own. Each case will be reviewed on its own merit, but counsel's tactical decision to minimize the damage by avoiding emphasis of the statement will not be considered a waiver of the issue.

*Id.* at 93 (emphasis added). On the merits, we held that the court did not abuse its discretion by denying the motion for mistrial because the police officer's response was

-26-

appropriate given the question asked and was not intended to improperly bolster witness testimony.[7]

Unlike the defendant in *Hardaway*, Walls did not take the position that as a general rule a no "adverse inference" instruction does more harm than good and therefore should not be given. With Walls's consent and agreement, the no "adverse inference" instruction was given to the venire panel before *voir dire* and to the seated jurors at the close of the evidence. He had a right under Maryland common law to veto the court's decision to give those instructions on the ground that they were harmful and not protective of his right not to testify, but he did not invoke it. He only vetoed the court's giving the no "adverse inference" instruction (in identical form) at the beginning of the evidence phase of the trial, when, as we have explained, it would have timely and effectively cured the minimal damage from the prosecutor's improper comment without highlighting the comment. In these circumstances, Walls's decision to decline the offered curative instruction was a tactic to box the court into granting a mistrial unnecessarily, not an invocation of his right under *Hardaway*.

---

[7] In *Terry v. State*, 332 Md. 329 (1993), which we discussed in *Fleming*, and in *Hayes v. State*, 217 Md. App. at 159, the issue of waiver was addressed, but in situations very different from the case at bar. In both cases, the curative instruction the court offered to give would not have been effective in any event. In *Terry*, evidence of the defendant's prior conviction was admitted, erroneously, and the court offered to give an instruction that it could only be considered by the jurors for limited purposes, such as to prove intent, motive, and other specially relevant purposes, under Rule 5-404(b). The defendant declined the instruction on the ground that the evidence was not admissible for any purpose. In *Hayes*, the trial court declined to propound a required *voir dire* instruction, and then, in the middle of the trial, offered to do so. By then, the *voir dire* instruction would not have served its purpose, *i.e.*, would have been ineffective.

We do not agree with the State that Walls waived his right to challenge the court's denial of his mistrial motion by declining the curative instruction. He is entitled to argue on appeal that the proposed instruction would not have been curative and therefore a mistrial was required. However, if the proposed instruction would have been curative and not prejudicial, as we have concluded, Walls may not rest upon his right under *Hardaway*, which he did not invoke, to argue that the court abused its discretion in denying the mistrial motion when he rejected the proposed curative instruction as a strategy to force a mistrial. To hold otherwise would create a perverse incentive for defendants to refuse instructions that would otherwise cure prejudice flowing from an improper comment upon a defendant's right against self-incrimination.

Even if we were to conclude that the court abused its discretion in denying the mistrial motion, we nevertheless would hold that the court's error was harmless beyond a reasonable doubt. As discussed, the improper comment was isolated and unintentional. It was made after the jurors already had been instructed that Walls had an "absolute constitutional right not to testify." Unlike in *Simpson*, where criminal agency was disputed and the prosecutor's repeated references to what Simpson "will tell" the jurors about the crimes heightened the risk that the jurors would hold his silence at trial against him, here, it was undisputed that Walls was the person who killed Okemia and Cunningham. Only his state of mind at the time of the killings was in dispute. He relied upon his recorded statement to the police as evidence that he was in a highly emotional state immediately after the crimes, that he had become enraged upon seeing Okemia and Cunningham in an embrace, and that he went to the area of Venus Court to visit Franklin,

not to confront Okemia. The recorded statement included his assertion that he picked up the knife when he entered the townhouse, which also supported his defense. Given that Walls's defense was consistent with his recorded statement to the police, the risk that the jury might draw an adverse inference from his silence was not heightened.

Finally, unlike in *Simpson*, where the Court emphasized that the jurors only convicted the defendant on one of nine counts and that prosecution witnesses were subjected to vigorous cross-examination and were impeached at trial, here, the evidence at trial was largely undisputed. Walls did not contest that he knew that Okemia was with another man on December 1, 2012; that he kicked in the door of 24 Venus Court; that he went upstairs and stabbed Cunningham repeatedly; that he chased Okemia outside through Venus Court and onto Solar Circle; and that when he caught up with her, he stabbed her multiple times, stopping only when the knife handle broke off. The evidence showed that he twice admitted to taking the knife with him to 24 Venus Court. All of that evidence was consistent with the State's theory that Walls made the willful and premeditated decision to kill Cunningham and Okemia either prior to or after arriving at 24 Venus Court, and was inconsistent with Walls's position that he killed Cunningham and Okemia in hot-blooded response to legally adequate provocation. We are persuaded on these facts that the prosecutor's inadvertent misstatement in opening statement had no effect on the outcome of the trial and therefore was harmless beyond a reasonable doubt.

## II.

## Jury Instructions on First Degree Burglary

Before addressing Walls's two related contentions respecting the jury instructions on first degree burglary, as supplemented, we summarize the evidence relating to that charge.

On direct examination, Moore, the lessee of 24 Venus Court,[8] testified that Walls moved out around April 2012. As noted, he took his belongings with him and did not return to stay at the townhouse thereafter. The locks had been changed, he did not have a key, and he did not have Moore's permission to enter the townhouse.

On cross-examination, Moore was shown a form document she had signed, entitled "DHR VERIFICATION OF RENT AND LIVING ARRANGEMENTS" ("DHR Form"). At the top of the DHR Form it lists the "Customer" as "Bryant/Okemia Walls" and identifies their "Case Manager." Section I of the form states that it should be completed by the "LANDLORD OR RENTAL AGENT ONLY." That section, as completed by hand, states that "Mr. & Mrs. Bryant Walls" have been tenants at 24 Venus Court since February 6, 2011. It further states that they pay $500 per month in rent and that the total rent for the townhouse was $771 per month. In Section II, which also was to be completed by the "landlord or rental agent," the form identifies the occupants of 24 Venus Court as Moore, Okemia, and Walls. On May 21, 2012, Moore signed the form as

---

[8] Moore's ex-boyfriend also signed the lease. This is not the same boyfriend Moore was with on December 1-2, 2012. He no longer lived at 24 Venus Court in December 2012.

the "Landlord/Rental Agent." In Section III, which was to be "completed by tenant," Walls describes Moore as his stepdaughter. He signed the form on May 20, 2012. The form was not signed by Okemia.

On redirect examination, Moore testified that she signed the DHR Form after Walls had moved out. She had been charging Okemia $500 per month in rent. Walls never paid rent. She reiterated that Walls was no longer living with her mother in December 2012 and did not have her (Moore's) permission to be in the townhouse.

In the defense case, Angela testified that Walls and Okemia had separated numerous times over the seven years they had been married, but always had reconciled. The most recent separation was in July 2012. Since then, Walls had been staying with her and Rick. On the day Walls moved out of 24 Venus Court, he called Angela late at night. She went there to pick him up. He did not have any belongings with him. About three days later, Rick took him back to 24 Venus Court to collect his things. He brought a trash bag full of clothes and a Rubbermaid container with him. Since that time, he had stayed with them "on and off." She explained that sometimes he would be "gone for a day, sometimes he would be gone for a couple days." According to Angela, when he was gone, he was with Okemia. She said that Walls and Okemia "would get rooms at the Siesta Motel" and "[s]ometimes he would stay with her."

On cross-examination, Angela acknowledged having received a phone call from Walls on December 2, 2012, after he was arrested. During that call, Angela said to him, "You haven't even lived [at 24 Venus Court] for five months."

In his statement to the police, Walls said he and Okemia had met and had sex on November 29, 2012, at the Siesta Motel. He claimed that on the night of December 2, 2012, he was planning to spend the night at 1 Venus Court with Hicks and Franklin. He said that he often stayed there. Upon seeing Okemia and Cunningham through the window, he became enraged. He gained entry to 24 Venus Court by kicking in the front door.

At the close of all the evidence, counsel met with the trial judge in chambers to discuss jury instructions. Walls's lawyer asked the court to give two supplemental instructions on first degree burglary. The first was patterned on *Hobby v. State*, 436 Md. 526 (2014). It stated: "You are instructed that, under the law, the temporary absence of a resident from the home does not mean the home is no longer his residence, or that the home is 'someone else's dwelling.'" The second was taken from *Warfield v. State*, 315 Md. 474 (1989):

> Even when there may be no actual legal right, the law gives a person the right to be on or inside property if the person reasonably believes he has a right to be present. In this case, you have heard testimony that Meishon Moore signed [the DHR Form] where Okemia Walls and Bryant Walls were listed as tenants at 24 Venus Court, Parkville, Maryland. The fact that Meishon Moore did not have the legal right to allow Okemia Walls and Bryant Walls to sublet the premises from her does not mean that Bryant Walls did not have the right to be there. A person who has a reasonable belief that he has a right to be at a location may legally be present if he has a reasonable belief that he is permitted to do so.

The trial court declined to give either instruction. It gave Maryland Criminal Pattern Jury Instruction (MPJI-Cr) 4:06, which it supplemented as emphasized:

> The Defendant is charged with burglary in the first degree. Burglary in the first degree is the breaking and entry of someone else's dwelling with the

intent to commit either murder or manslaughter or first degree assault. In order to convict the Defendant of burglary in the first degree, the State must prove

First, that there was a breaking; second, that there was an entry; third, that the breaking and entry was in someone else's dwelling; fourth, that the breaking and entry was done with the intent to commit either murder, manslaughter or first-degree assault inside the dwelling; and fifth, that the Defendant was the person who broke and entered.

Breaking means the creation or enlargement of an opening such as a breaking or opening of a window or pushing open a door; entry means any part of the Defendant's body was inside the house, and a dwelling is a structure where someone regularly sleeps.

***

*Now, in determining whether 24 Venus Court was someone else's dwelling, the State must prove that the Defendant had no right to enter that dwelling without the permission of one of the occupants.*

After the court instructed the jury, defense counsel noted an exception to the burglary instruction. Referencing the discussion in chambers, she argued that the instruction did not adequately explain that if Walls held a reasonable belief that he had permission to enter 24 Venus Court, that was a complete defense to burglary. Moreover, defense counsel argued, the court had not advised the jury that the State bore the burden of proving that Walls's entry into that dwelling was not licensed, legal, or privileged. Defense counsel emphasized that 24 Venus Court was not the residence "of a stranger," but was the place where Walls had lived, where the DHR Form appeared to give him license to live, and where his wife had continued to live. Defense counsel also noted an exception to the court's refusal to instruct the jury, based upon *Hobby*, that an occupant of a dwelling does not relinquish his or her possessory interest in the dwelling by temporarily leaving that residence.

The trial judge overruled the exceptions, explaining that she believed that the instructions as given adequately covered the applicable law. The jury began deliberating that afternoon. About two hours later, the court received a note from a juror asking, "What is the legal definition of someone else's dwelling?"

The court discussed the appropriate response to that question with counsel. Defense counsel reiterated her requests for the two supplemental instructions, arguing that they were the proper response to the jury note.

Over defense counsel's objection, the court reinstructed and supplemented the burglary instruction as follows (supplemented portion in italics):

> In determining whether 24 Venus Court was someone else's dwelling, the State must prove that the Defendant had no right to enter the building without the permission of one of the occupants. *It is up to you to determine whether the Defendant had a reasonable belief that he had a right to enter that location without obtaining the permission of another occupant.*

While the jury remained in the courtroom, a juror asked the trial judge another question: "On my first question of someone else's dwelling, you expanded on that definition and you used the word 'occupant.' How do you define occupant?" The court advised the jurors that it could not answer that question "on the fly," but would get back to them with a response.

Outside the presence of the jury, defense counsel again asked the court to give the previously requested instructions, which did not use the term occupant and, as such, did not require that an additional definition be provided. The court responded that that was not responsive to the discrete question posed, which asked for the definition of the term "occupant." The court opined:

The question that they are asking – what I said is, "It's up to you to determine whether he had a right to enter without obtaining the permission of another occupant.["] They want to know what an occupant is. An occupant is someone with a legal right to be present at a location, and I'm inclined to tell them exactly that.

Defense counsel objected, arguing that the court's response could cause confusion because a person without a legal right to be present still could hold a reasonable belief that they possessed a right to enter and, if that were so, they could not be found to have entered "the dwelling place of another."

The court disagreed. It supplemented its instruction to advise the jury that an occupant is "someone who does have a legal right to be present in the dwelling."

Maryland's statutory offense of burglary in the first degree is "akin to common law burglary, without the element of 'in the nighttime.'" *McKenzie v. State*, 407 Md. 120, 127 n.1 (2008). It requires proof that a defendant (1) broke into the dwelling of another; and (2) did so with the intent to commit theft or a crime of violence. Md. Code (2002, 2012 Repl. Vol.), section 6-202 of the Criminal Law Article.

To be found guilty of breaking into the dwelling of another, a defendant must have had an "awareness that [the intrusion into the premises] was unwarranted[, *i.e.*,] lacking authority, license, privilege, invitation, or legality." *Warfield*, 315 Md. at 500. "It is a complete defense to [a charge of] burglary . . . [that the defendant had] **BOTH** 1) a subjective belief . . . that the intrusion was warranted **AND ALSO** 2) [that such a belief was] objective[ly] reasonable[]." *Herd v. State*, 125 Md. App. 77, 108 (1999) (emphasis in original). There is a rebuttable presumption that a defendant's entry into premises owned or leased by another is not authorized, licensed, or privileged. *Id*. at 103. The

-35-

defendant bears the initial burden of production to show that he had an honest and reasonable belief that his intrusion was authorized. *Id*. at 104. If he satisfies that burden and generates "a genuine jury issue," the burden shifts to the State to persuade the fact-finder either that the defendant did not "actually entertain such a subjective belief **OR** that such a belief, even if entertained, was not objectively reasonable." *Id*. at 108 (emphasis in original).

Walls contends the court erred by declining to instruct the jury that in order to find that he had committed a breaking and entering of "the dwelling of another," the State had to prove beyond a reasonable doubt that he did not "reasonably believe[] that he had the authority, license, privilege, or invitation to enter [24 Venus Court]." He maintains that a "reasonable belief" instruction was generated by the evidence that he had lived at 24 Venus Court with Okemia, that he still had belongings there, that he had moved out and returned on prior occasions, and that he was listed on "some legal document, albeit not the lease itself," as a tenant there. Thus, he asserts, the court was required to give the instruction.

The State responds that the court did not err by denying the requested "reasonable belief" instruction because Walls did not testify at trial or present any evidence that he had an actual belief that he had permission to enter 24 Venus Court on December 2, 2012. In any event, the State emphasizes that in response to the jury note, the court in fact gave a "reasonable belief" instruction, thus giving Walls "more than he was entitled to."

The trial court must give a requested jury instruction if it is a correct statement of the law, is generated by the evidence, and the content of the instruction is not fairly covered by other instructions actually given. *Ware v. State*, 348 Md. 19, 58 (1997).

In all three cases Walls relies upon—*Warfield*, 315 Md. at 474, *Green v. State*, 119 Md. App. 547 (1998), and *Herd*, 125 Md. App. at 77—there was some evidence generated that the defendant had an actual belief that he had a right to enter the premises in question.[9]  In *Warfield*, the defendant was hired by an elderly woman to shovel snow on the walkways on her property, including a walkway that ended at the door to her detached garage.  He opened the door to the garage and entered it.  He was charged and convicted of fourth degree burglary, as well as the theft of coins stored in the garage.  In holding that the evidence was legally insufficient to sustain the burglary convictions, the Court of Appeals noted that the defendant was on the owner's property by invitation and he "indicated a belief that it was necessary in the performance of his [snow-shoveling] duties that he open the garage door and enter the garage to get at the snow piled up against the door." 315 Md. at 501.  The Court held that the evidence established, as a matter of law, that the defendant held an actual belief that he had a right to be present inside the garage and that that belief was objectively reasonable.

In *Green*, the defendant was convicted of fourth degree burglary for entering the home of his ex-girlfriend ("McDougald") in the early morning hours, through a basement

_____

[9] *Warfield*, *Green*, and *Herd* all involve convictions for fourth degree burglary. Fourth degree burglary is a lesser included offense of first degree burglary. *See Bass v. State*, 206 Md. App. 1, 12 (2012).

window.  McDougald testified that she and Green had a child together.  Green had lived with her at her house "for a brief period" of time, but had not "stayed with her during the week preceding the incident."  119 Md. App. at 550.  On one occasion when he stayed with her, he had left painting supplies in her house that he used for his job.  He had returned to pick up the supplies prior to the night he entered through the window.  He did not have her permission or invitation to enter her home on the night in question.

Green testified in his defense that he and McDougald had an on-again-off-again relationship.  At the time of his arrest, he had been staying with her "a couple of days a week."  *Id*. at 551. He had been at her house the night before, but had left to go drinking with some friends.  When he returned in the early morning hours, he rang the doorbell and called her on the telephone, but she did not respond.  He had to get his clothes and painting supplies from inside the house, so he went around the back and entered through the basement window.  He had entered the house through the basement window on prior occasions because McDougald refused to give him a key.  If she told him she planned to go out in the evening, he would respond "well, I know how to get in, you know, I'll be there when you get there." *Id*. at 552.

Citing *Warfield*, Green's lawyer asked the court to instruct the jury that the State had to prove "criminal intent" and that criminal intent would be lacking if Green reasonably believed he had permission or license to enter McDougald's house.  *Id*. at 553.  The court denied the requested instruction and instructed the jury that the State had to prove that "one, that there was a breaking, two, that there was an entry, three, that the

-38-

breaking and entering was into someone else's dwelling house, and, four, that [Green] was the person who committed the breaking and entering." *Id*.

On appeal, Green argued that the pattern instruction was not sufficient because there was evidence that he "reasonably believed he had implied permission to enter McDougald's residence, which constituted a defense to the charge under *Warfield*." *Id*. at 557. We agreed. We explained that in *Warfield* the Court of Appeals had held that even if "one *intends* to enter the property of another, . . . one must be 'aware of the fact that he is making an unwarranted intrusion'" to be found guilty of breaking and entering. *Id*. at 560 (quoting *Warfield*, 315 Md. at 498) (emphasis in original). Put another way, it is "'an affirmative defense . . . if "the actor reasonably believed that the owner of the premises . . . would have licensed him to enter."'" *Id*. (quoting *Warfield*, 315 Md. at 498, in turn quoting 2 Model Penal Code and Commentaries § 221.2(3)(c), at 144).

We concluded that the evidence adduced at Green's trial "clearly generated" "the issue of implied permission." *Id*. Green had lived with McDougald previously and was the father of her child. Green had testified that he and McDougald had an "on and off" relationship, that he had been staying with her for a few days each week, that he had stayed with her the night prior to the alleged break in, and that he had previously entered the residence through the basement window with McDougald's knowledge and implicit consent. We reasoned that while the jury would have been free to reject Green's testimony, because the court declined to instruct them on the affirmative defense, the jury was "never called upon to judge [Green's] credibility" or to determine whether he entered

McDougald's residence with an "'awareness that it was unwarranted.'" *Id*. at 561 (quoting *Warfield,* 315 Md. at 500).

Finally, in *Herd*, the defendant, a licensed bailbondsman, was convicted of fourth degree burglary after a bench trial on an agreed statement of facts. While attempting to apprehend a fugitive who had failed to appear for trial, the defendant learned from someone at the fugitive's last known address that the fugitive was now staying at a different house in Baltimore City. The defendant and two other bailbondsmen went to that house and knocked on the door, but received no answer. Hearing sounds inside the home, they used an axe to break the lock off the front door and enter the house. We held that the trial court, sitting as the fact-finder, properly applied the burdens, concluding that, on the agreed statement of facts, the affirmative defense of a reasonable belief was generated; that the State had not disproved that the defendant held a subjective belief that the fugitive was present at the house, giving him license to enter to apprehend him; but that the State had met its burden of persuasion that that belief was objectively unreasonable under the circumstances.

In the case at bar, Walls did not adduce any evidence to show that he actually believed he had the right to enter 24 Venus Court without the permission of Okemia or Moore. And, on the contrary, there was evidence that Walls had a subjective belief that he did *not* have a right to enter 24 Venus Court. He made his way into 24 Venus Court on the night in question by kicking down the door. He did not use a key, he did not knock, he did not ask Moore, who he had just seen, to let him in, and he did not attempt to call Okemia to request that she let him in. In his statement to police, he gave the Joppa

-40-

address as his residence and said nothing to suggest any belief that he had a right to enter 24 Venus Court that night. The evidence that Walls was listed as a tenant on the DHR Form and Angela's testimony that he may have stayed with Okemia at times during their separation was evidence that may have shown an objectively reasonable belief that he had the right to enter 24 Venus Court, but it was not sufficient to meet his burden of production to show an actual belief that he had the right to enter on December 2, 2012. Because Walls failed to generate a genuine jury question on the issue of whether he had an actual belief that he had the right to enter 24 Venus Court on the night in question, the court did not err by declining to give his requested jury instruction.

Walls also contends the court erred by not instructing the jury, pursuant to *Hobby*, 436 Md. at 526, that the fact that he had temporarily moved out of 24 Venus Court did not mean that he had relinquished his possessory interest in that dwelling.

The State responds that the instruction patterned on *Hobby* was not generated by the evidence and, as such, the court properly refused to give it. We agree.

In *Hobby*, a homeowner moved out of her home during a foreclosure proceeding. While the house was unoccupied, the defendant entered the home and, without the owner's knowledge or permission, lived there for six months. The defendant was arrested and charged with various crimes including first degree burglary. He appealed from his conviction for that crime (and others) and, as relevant here, argued that the evidence was legally insufficient to convict him of burglary because the home was no longer a "dwelling" when he moved in. In rejecting that contention, the Court of Appeals held that a building becomes a "dwelling" when it is used for "'human habitation.'" 436

-41-

Md. at 555 (quoting *McKenzie,* 407 Md. at 127). Once a building has been occupied as a dwelling, however, it does not "'lose its character as a dwelling simply because it is left vacant for a time.'" *Id.* (quoting *McKenzie*, 407 Md. at 127). The fact that the owner of the house had moved out and left the house vacant while it was on the market did not alter the character of the house as a dwelling because the owner clearly intended for the home to be occupied again in the future.

In the case at bar, the instruction requested by Walls—that, under the law, the temporary absence of a resident from the home does not mean the home is no longer his residence, or that the home is 'someone else's dwelling'"—was neither a correct statement of the holding in *Hobby* nor was it generated by the evidence. *Hobby* did not address whether a resident's temporary absence from a dwelling deprived *the resident* of his or her possessory interest in that dwelling. Rather, it concerned whether that absence deprived *the building* of its character as a dwelling. Here, there was no dispute that 24 Venus Court was a dwelling. It was occupied by Moore and Okemia at all relevant times. The trial court did not err by declining to give the requested instruction.

## III.

## Jail Phone Call

Walls contends the trial court erred by permitting a recording of a telephone call from the BCDC to be admitted into evidence over his objection because it was not properly authenticated by testimony or other evidence showing that the voice of the caller was his.

-42-

The State responds that this contention is not preserved because Walls did not raise this issue before the trial court nor did the trial court decide the issue.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Md. Rule 5-901(a). "[T]he burden of proof for authentication is slight." *Dickens v. State*, 175 Md. App. 231, 239 (2007). Rule 5–901(b)(5) provides "[b]y way of illustration only" that voice identification may be authenticated: "whether heard firsthand or through mechanical or electronic transmission or recording, based upon the witness having heard the voice at any time under circumstances connecting it with the alleged speaker."

The phone call in question was placed on December 16, 2012, from BCDC to a woman named Renee.[10] On the first day of trial, defense counsel objected to the introduction of portions of the recording of the call, arguing that the jail call was not admissible without the live testimony of the custodian of records, which she maintained would be an employee of a private company that BCDC contracted with for the recording of the calls. At no time did she argue that the call was inadmissible without testimony establishing that the voice of the caller was Walls.

On the third day of trial, the State sought to introduce the recording into evidence during the testimony of Detective Wolf. At that time, the court asked defense counsel if she wished to "preserve [her] objection for the record?" She replied, "Yes, your Honor,

---

[10] It is apparent from discussions between counsel and the court that Renee is Walls's daughter.

preserving my objections to [the] jail call . . . as well as objections to not having the custodian of record as we requested and the nature of the certification and bringing it in through Detective Wolf." The court overruled her objections and admitted a recording of the jail call as a business record. The recording was then played for the jury.

We agree with the State that this issue is not preserved for review. The argument Walls advances on appeal—that the State failed to properly authenticate the recording of the jail call by presenting evidence that the voice of the caller was that of Walls—was neither raised nor decided below. Md. Rule 8-131(a). Walls's argument in the trial court was that the custodian of records needed to testify about the manner in which the calls were made and recorded.

In any event, we agree with the State that the substance of the phone call itself, in which the caller describes the night of the murders in great detail and uses his nicknames for Okemia and Moore (Mami and Mimi) was strong circumstantial evidence that the caller was Walls and was sufficient to support its admission. *See* Md. Rule 5-901(b)(4) (evidence may be authenticated by circumstantial evidence that the "offered evidence is what it is claimed to be").

**IV.**

**Prosecutorial Misconduct**

Finally, Walls contends the circuit court erred by denying him relief on a pretrial motion for sanctions in which he alleged that the prosecutor had interfered with his right to investigate and interview potential witnesses. In his motion, Walls asserted that the prosecutor had sent letters to "civilian witnesses in this matter" advising them:

You are listed as a witness for the State in the above murder case. As a result, a public defender (defense attorney for the above defendant, Bryant Walls) or a defense investigator may contact you. These people work for the defendant, and he is charged with first degree murder. They may not be clear about this fact when speaking with you, and may in fact imply that they are working for this office, the Office of the State's Attorney.

You may speak with the defendant's attorneys or the defendant's investigators if you wish. The decision whether to talk to them or not is up to you. You are under no obligation to speak to them; in other words, you do not have to talk to them. If you decide to talk with them, you may be asked what you said during cross-examination at trial.

Please contact me if you have any questions about this information. Please also let me know if an investigator or attorney working for the defendant contacts you.

Two witnesses who received these letters, Hicks and Hunter, were called by the State at trial. Angela, who as mentioned was called as a defense witness, also received a letter.[11]

Walls argued during pretrial hearings that these letters discouraged witnesses from speaking to the defense by implying that defense counsel would lie to them and twist their words. He asked the court to sanction the State for misconduct by either dismissing the indictment or precluding the State from calling any witness to whom it had sent these letters. He argued, moreover, that he did not have to show any particularized prejudice because the "chilling effect" of the letters was self-evident.

The court denied the motion for sanctions, ruling that the letters were not "so over the line as to on its face constitute misconduct." The court concluded, moreover, that Walls had made "no showing that there's any impact or any connection between this letter and what [the recipients of the letters] will say or not say."

---

[11] In his brief, Walls mistakenly states that Angela was called as a State's witness at trial.

On appeal, Walls contends the court's ruling was in error and that we should remand for the trial court to "determine whether the letter resulted in any prejudice to the defense." The State responds that the court did not abuse its discretion by denying the motion for sanctions because the letter did not direct witnesses that they could not or should not speak to the defense and, in fact, informed them that it was up to them. It argues, moreover, that Walls had an opportunity in the pre-trial hearing to present evidence that he was prejudiced and failed to do so, and that that was an independent basis supporting the court's denial of the motion.

We perceive no abuse of discretion by the circuit court. The letters did not direct witnesses not to talk to the defense. The court did not err in finding that sending the letters, though "ill-advised," did not rise to the level of sanctionable prosecutorial misconduct. Even if the letters had amounted to misconduct, we still would affirm the court's denial of relief on the basis that Walls failed to present any evidence that he had been prejudiced by the sending of the letters.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**